**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Orestes Ybarra, | CV 25-00006-TUC-CKJ (MAA) |
| Petitioner, | **REPORT AND RECOMMENDATION** |
| vs. | |
| Ryan Thornell, Director AZ Department of Corrections; et al., | |
| Respondents. | |

Pending before the court is a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed on January 6, 2025, by the petitioner, Orestes Ybarra. Doc. 1. Ybarra is currently incarcerated in the Arizona State Prison Complex in Florence, Arizona. *Id.*, p. 1.

Pursuant to the Local Rules of Practice, the matter was referred to the Magistrate Judge for a report and recommendation. Doc. 4; LRCiv 72.2(a)(2). A hearing on the petition was held on April 24, 2025. Doc. 10.

The Magistrate Judge recommends that the District Court, after its independent review of the record, enter an order denying the petition. Ybarra's claim that trial counsel was ineffective is procedurally defaulted. In the alternative, it should be denied on the merits. The prosecutor's strike of the only African-American on the jury panel was not illegal discrimination in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986).

Summary of the Case

Ybarra was convicted after a jury trial of two counts of sexual assault. *State v. Ybarra*, 2019 WL 2233299, at *2 (Ariz. Ct. App. May 22, 2019). The state provided evidence that

Ybarra was an assistant at a physical therapy clinic and sexually assaulted the victim, M.B., in the guise of performing physical therapy treatment. *Id*. at *1.

"Ybarra was [originally] charged with two counts of sexual assault . . . one count of sexual abuse . . . and one count of indecent exposure." *Id*. at *2. At his first trial, Ybarra testified that he gave M.B. a "soft tissue massage on her butt" because she complained of pain there. *Id*. "The jury found Ybarra not guilty of sexual abuse and indecent exposure but could not reach a verdict on the two sexual assault counts." *Id*. "At his second trial for the two remaining sexual assault counts, Ybarra did not testify, but portions of his testimony from the first trial were read to the jury." *Id*. "That jury found Ybarra guilty of both counts of sexual assault and the trial court sentenced him to a twenty-one-year prison term." *Id*. (punctuation modified).

On direct appeal, Ybarra argued that (1) "[t]he trial court erred in refusing Ybarra's request that the second jury be informed he was acquitted of two counts at the first trial," (2) "[t]he trial court erred as a matter of law by denying Ybarra's *Batson* challenge to the strike of the only African-American on the jury panel," (3) "the trial court denied Ybarra his Sixth Amendment right to retained counsel of choice," and (4) the trial court erred by precluding evidence that "M.B. had been the victim of an earlier incident of sexual misconduct in which the perpetrator was not prosecuted." Doc. 1-3, pp. 3-4. The Arizona Court of Appeals affirmed Ybarra's convictions and sentences in a decision dated May 22, 2019. *State v. Ybarra*, 2019 WL 2233299, at *2 (Ariz. Ct. App. May 22, 2019). Ybarra filed a petition for review with the Arizona Supreme Court, which was denied on March 4, 2020. Doc. 7, p. 220.

Ybarra filed a notice of post-conviction relief on May 6, 2020. Doc. 7, p. 226. In his petition, Ybarra argued that (1) trial counsel was ineffective for interfering with Ybarra's right to testify and (2) the civil lawsuit filed by M.B. and her parents constituted "newly discovered evidence that entitled Ybarra to a new trial." Doc. 1-6, pp. 7, 19. The trial court denied the petition following a two-part evidentiary hearing. Doc. 1-7, pp. 2-29; Doc. 7, pp. 691-718. Ybarra filed a petition for review on August 29, 2023. Doc. 7, pp. 720-775, 770. The Arizona

Court of Appeals issued an order granting review but denying relief on April 12, 2024. *State v. Ybarra*, 2024 WL 1609338, at *1 (Ariz. Ct. App. Apr. 12, 2024).

Ybarra filed the pending petition for writ of habeas corpus on January 6, 2025. Doc. 1. He claims that (1) trial counsel were ineffective for providing "deficient, prejudicial advice when instructing Ybarra not to testify in his second trial after he testified in his first trial which ended with acquittals on two counts and no convictions on the other two" and (2) his Sixth Amendment right to a fair trial was violated when the prosecution used a peremptory strike against a Black jury panel member at his second trial. *Id*., pp. 6, 7.

The respondents filed an answer on February 24, 2025. Doc. 7. They allow that Claim 2 is exhausted and that Claim 1 is exhausted "[t]o the extent this claim is the same claim as his claim that his counsel *interfered* with his right to testify." Doc. 7, pp. 7-8 (emphasis in original). They argue that these claims should be denied on the merits. Doc. 7. They argue in the alternative that if Ybarra is now claiming that counsel's advice not to testify was deficient performance, this claim was not properly exhausted and is procedurally defaulted. Doc. 7, p. 14. Ybarra filed a reply on March 12, 2025. Doc. 8. A hearing on the petition was held on April 24, 2025. Doc. 10.

Standard of Review

The writ of habeas corpus affords relief to persons in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). If the petitioner is in custody pursuant to the judgment of a state court, the writ will not be granted unless prior adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). If the highest state court fails to explain its decision, this court looks to "the last reasoned state court decision." *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003).

"[The] standard is intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316, 135 S.Ct. 1372, 1376 (2015) (punctuation modified). "'[C]learly established Federal law' for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of th[e] [Supreme] Court's decisions." *Id.*

A decision is "contrary to" Supreme Court precedent if that Court already confronted "the specific question presented in this case" and reached a different result. *Woods*, 575 U.S. at 317, 135 S.Ct. at 1377. A decision is an "unreasonable application of" Supreme Court precedent if it is "objectively unreasonable, not merely wrong; even clear error will not suffice." *Id*. at 316, 1376. "To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. (punctuation modified)

If the petitioner argues that prior adjudication "resulted in a decision that was based on an unreasonable determination of the facts" pursuant to section 2254(d)(2) then "the petitioner must establish that the state court's decision rested on a finding of fact that is *objectively* unreasonable." *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (punctuation modified) (emphasis in original).

Federal habeas review is limited to those claims for which the petitioner has already sought redress in the State courts. This so-called "exhaustion rule" reads in pertinent part as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that – (A) the applicant has exhausted the remedies available in the courts of the State. . . .

28 U.S.C. § 2254(b)(1)(A).

"Exhaustion requires that a petitioner 'fairly present' his federal claims to the highest State court available." *Davis v. Silva*, 511 F.3d 1005, 1008–09 (9th Cir. 2008). "Fair presentation requires that the petitioner describe in the State proceedings both the operative facts and the federal legal theory on which his claim is based so that the State courts have a 'fair

- 4 -

opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim." *Id.* (punctuation modified). "Thus, for purposes of exhausting State remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." *Id.* The petitioner must make the federal basis of the claim explicit either by citing specific provisions of federal law or federal case law, even if the federal basis of a claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), *cert. denied*, 528 U.S. 1087 (2000), or by citing State cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

If the petitioner is in custody pursuant to a judgment imposed by the State of Arizona, he must present his claims to the Arizona Court of Appeals for review, which is the highest "available" State court. *Castillo v. McFadden*, 399 F.3d 993, 998 (9th Cir. 2005), *cert. denied*, 546 U.S. 818 (2005); *Swoopes v. Sublett*, 196 F.3d 1008 (9th Cir. 1999), *cert. denied*, 529 U.S. 1124 (2000). If State remedies have not been properly exhausted, the petition may not be granted and ordinarily should be dismissed without prejudice. *See Johnson v. Lewis*, 929 F.2d 460, 463 (9th Cir. 1991). In the alternative, the court has the authority to deny on the merits rather than dismiss for failure to properly exhaust. 28 U.S.C. § 2254(b)(2).

A claim is "procedurally defaulted" if the State court declined to address the claim on the merits for procedural reasons. *Franklin v. Johnson*, 290 F.3d 1223, 1230 (9th Cir. 2002). Procedural default also occurs if the claim was not presented to the State court and it is clear the State would raise a procedural bar if it were presented now. *Id.*

The procedural default rule bars consideration of the petitioner's habeas claim if the State procedural rule is "independent and adequate." *Bennett v. Mueller*, 322 F.3d 573, 580-583 (9th Cir. 2003). The rule must be independent of federal law and must be "well-established and consistently applied." *Id.*

Procedural default may be excused if the petitioner can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Boyd v.*

*Thompson*, 147 F.3d 1124, 1126 (9th Cir. 1998). "To qualify for the fundamental miscarriage of justice exception to the procedural default rule, however, [the petitioner] must show that a constitutional violation has probably resulted in the conviction when he was actually innocent of the offense." *Cook v. Schriro*, 538 F.3d 1000, 1028 (9th Cir. 2008).

If a claim is procedurally defaulted and is not excused, the claim should be dismissed with prejudice because the claim was not properly exhausted and "the petitioner has no further recourse in State court." *Franklin*, 290 F.3d at 1231.

Discussion: Ineffective Assistance of Trial Counsel

In Claim 1, Ybarra argues that trial counsel were ineffective for providing "deficient, prejudicial advice when instructing Ybarra not to testify in his second trial after he testified in his first trial which ended with acquittals on two counts and no convictions on the other two." Habeas Petition, Doc. 1, p. 6. The court concludes that this claim was not properly exhausted and is procedurally defaulted. In the alternative, the claim should be denied on the merits.

Ybarra describes his claim as follows:

> Mr. Ybarra's main contention is that his trial attorneys were ineffective when they misadvised him about remaining silent in his second trial, though they knew or should have known that Ybarra was the sole source of evidence for his defense. Without Ybarra's testimony, the defense that these attorneys selected could have never worked, as a matter of law. In other words, the Arizona appellate court's "deference" to trial counsel's "strategic decision" was wholly unreasonable and contrary to clearly established federal law.

Doc. 1-2, p. 10. Ybarra argues in the pending petition that counsel's advice to not testify was deficient performance and counsel's representation was constitutionally ineffective. In his Rule 32 post-conviction relief petition, Ybarra also argued that counsel was ineffective, but he raised a different issue.

In his Rule 32 petition, Ybarra argued that "defense counsel's interference with Ybarra's constitutional right to testify amounted to ineffective assistance of counsel." Rule 32 Petition, Doc. 1-6, p. 7. He maintained that he "wanted to testify at his second trial, just as he had at his first trial" but counsel believed strongly that he should not testify. Doc. 1-6, p. 8. And counsel

- 6 -

was so adamant that he should not testify, that counsel interfered with his right to testify in a way that was unconstitutional. Doc. 1-6, p. 13. He argued as follows:

> At the time Ybarra relinquished to defense counsel's repeated urging that he elect not to testify at the second trial, he did not realize or understand that the decision to testify belonged solely to him. . . . His attorneys told him repeatedly that they thought it was a bad idea and did not prepare him to testify at the second trial. . . . As a result he felt pressured by his attorneys and, particularly his uncle Frank, whom he deeply trusts and respects, not to testify. . . . Due to the constant pressure, Ybarra did not feel at liberty to testify at his second trial. . . . He truly believed that it was no longer his decision to make and that he had no choice but to give in to his attorneys' wishes. Had Ybarra know that the decision whether or not to testify rested solely with him, he would have unequivocally exercised his right to testify at his second trial, as he did at his first trial.

Rule 32 Petition, Doc. 1-6, pp. 13-14 (punctuation modified). Ybarra quoted *United States v. Curtis*, 742 F.2d 1070, 1076 (7th Cir. 1984) for the proposition that "[i]f a defendant insists on testifying however irrational that insistence might be from a tactical viewpoint, counsel must accede." Doc. 1-6, p. 15. Ybarra supported his argument with an affidavit from an attorney expert who opined that counsel "fell below the standard of care with respect to Ybarra's right to testify because they should have: (1) called him as a witness as he requested, and (2) if they felt the need to make a record, advise the court, assuming they had the defendant's permission to do so, that the defendant's decision to testify was against their advice." Doc. 1-6, p. 18.

The trial court held an evidentiary hearing on the claim and took testimony from defense counsel, Ybarra, attorney Frank Leto (Ybarra's uncle), and attorney Stephen Weiss (an expert in the standard of care). Rule 32 "Under Advisement" Ruling, Doc. 1-7, pp. 11-19. It found that Ybarra decided not to testify and this decision was a "knowing, intelligent, and voluntary decision, made after considering the advice of his counsel." Doc. 1-7, pp. 24-25. The trial court further decided that Ybarra could not prove that he was prejudiced by counsel's alleged deficient performance. The trial court explained that it "cannot find that had Mr. Ybarra testified in the second trial, the result in that proceeding would have been any different." Doc. 1-7, p. 26.

In his petition for review with the Arizona Court of Appeals, Ybarra again argued that "the trial court erred in concluding [he] failed to prove Trial Counsel prejudicially interfered with his constitutional right to testify at his second trial." Petition for Review, Doc. 1-8, p. 4.

- 7 -

He explained that "[t]he only real question is whether Trial Counsel's actions in urging him to not testify – including tasking Leto (who was Ybarra's trusted and beloved uncle and was himself a criminal defense attorney with decades of experience) with trying to persuade him – went so far as to interfere with Ybarra's right to testify." Doc. 1-8, p. 53.

In his Rule 32 proceedings, Ybarra claimed that his counsel *interfered* with his right to testify. In the pending petition, Ybarra claims that counsel's advice not to testify was deficient performance. These are different claims. *See Davis v. Silva*, 511 F.3d 1005, 1008–09 (9th Cir. 2008) (A claim consists of "both the operative facts and the federal legal theory."); *Weber v. Ryan*, 2017 WL 10296856, at *6 (D. Ariz. Mar. 9, 2017) ("[W]hile new factual allegations do not ordinarily render a claim unexhausted, a petitioner may not fundamentally alter the legal claim already considered by the state courts.") (punctuation modified), report and recommendation adopted, 2018 WL 4620546 (D. Ariz. Sept. 26, 2018).

Ybarra maintains that in his Rule 32 petition, he *did* discuss why "keeping Ybarra off the witness stand in the second trial was poor strategy since Ybarra testified in his first trial which ended in no convictions." Reply Brief, Doc. 8, p. 5. He cites to page 16 in his Rule 32 petition. Doc. 8, p. 5. The court, however, does not agree with Ybarra's reading. The Rule 32 petition "touched upon" the wisdom of counsel's advice, but that advice was not presented as part of his claim. Doc.8, p. 6. On page 16 of the Rule 32 petition, Ybarra explained that counsel "believed it was a bad idea to testify" and pressured him into not doing so by "employing [his uncle] Leto to act as their agent in piling on pressure to keep Ybarra off the witness stand." Doc. 1-6, p. 16. The gravamen of his Rule 32 claim was that he was denied his right to testify, not that defense counsel's advice to stay silent was poor trial strategy. *Id*.

In fact, later in his Rule 32 petition, Ybarra stated that, "[w]hile there was certainly *nothing wrong* with defense counsel's action in informing Ybarra of their opinion that testifying was not in his best interest, they went too far by repeatedly urging him not to testify and by enlisting Ybarra's trusted family member . . . to convince him to succumb to that recommendation." Doc. 1-6, p. 18 (emphasis added). In the pending habeas petition, Ybarra states the opposite, arguing that defense counsel was indeed wrong to inform Ybarra of their

- 8 -

opinion that testifying was not in his best interest because testifying was absolutely in his best interest, and counsel's opinion otherwise was deficient performance.

"As a general matter, each unrelated alleged instance of counsel's ineffectiveness is a separate claim for purposes of exhaustion." *Gulbrandson v. Ryan*, 738 F.3d 976, 992 (9th Cir. 2013) (punctuation modified) (Claim that counsel was ineffective for failing to present expert testimony on the defendant's state of mind at the time of the crime did not exhaust claim that counsel was ineffective for failing to present the same expert testimony at sentencing on his potential for rehabilitation.). Ybarra's ineffective assistance of counsel ("IAC") claim in his Rule 32 petition did not exhaust his IAC claim in the pending habeas petition.

Ybarra did not properly exhaust the ineffective assistance of counsel claim he brings in the pending petition. *See Davis v. Silva*, 511 F.3d 1005, 1008–09 (9th Cir. 2008) ("Fair presentation requires that the petitioner describe in the State proceedings both the operative facts and the federal legal theory on which his claim is based so that the State courts have a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim."). He cannot raise it now in a second PCR petition. *See* Ariz.R.Crim.P. 32.2(a), 32.4(a); *see also* Doc. 7, pp. 14-15. This claim is procedurally defaulted and should be denied with prejudice. *See Franklin v. Johnson*, 290 F.3d 1223, 1230 (9th Cir. 2002). The court finds, in the alternative, that the claim should be denied on the merits.

To succeed on an ineffective assistance claim, the habeas petitioner must prove "his counsel's performance was deficient in violation of the Sixth and Fourteenth Amendments" and "he was prejudiced by counsel's deficient performance." *Clark v. Arnold*, 769 F.3d 711, 725 (9th Cir. 2014).

"Counsel is constitutionally deficient if the representation fell below an objective standard of reasonableness such that it was outside the range of competence demanded of attorneys in criminal cases." *Clark*, 769 F.3d at 725 (punctuation modified). "When evaluating counsel's conduct, [the court] must make every effort to eliminate the distorting effects of hindsight, and to evaluate the conduct from counsel's perspective at the time." *Id*.

"A defendant is prejudiced by counsel's deficient performance if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Clark*, 769 F.3d at 725. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

Because hindsight is 20/20, "counsel should be strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment . . . and [] the burden to show that counsel's performance was deficient rests squarely on the defendant." *Burt v. Titlow*, 571 U.S. 12, 22–23, 134 S. Ct. 10, 17 (2013). State court review of counsel's performance is highly deferential. Federal court review on habeas is "doubly deferential." *Id*. at 15, 13.

Assuming, without deciding, that counsel's advice was poor, Ybarra cannot show that he was prejudiced. The Arizona Court of Appeals did not reach the issue of prejudice, but the trial court did. Doc. 1-7, pp. 25-26. This court looks through the Arizona Court of Appeals decision and considers the trial court's analysis. *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003) (If the highest state court fails to explain its decision, this court looks to "the last reasoned state court decision.").

The trial court observed that Ybarra's argument addressing prejudice was a fairly simple one. "[H]e simply contends that, because he testified at his first trial and was not convicted of any charges, his testimony in a second trial would have led to a similar, if not better result." Doc. 1-7, p. 25; *see also* Doc. 1-2, p. 59 (raising the same argument in the pending petition). The trial court rejected that argument for several reasons. First, the court observed that there is no way of knowing if the jury's not-guilty finding on the charges of sexual abuse and indecent exposure resulted from his testimony at the first trial. The jury could have found that the government simply failed to prove all of the elements of those offenses. The court observed that "[t]here are likely countless other plausible and reasonable explanations for the results of the first trial, many of which have nothing to do with Mr. Ybarra's testimony." Doc. 1-7, p. 26.

Moreover, it was not certain that Ybarra's testimony at the second trial would have been as "clear and concise" as it had been the first time. Doc. 1-7, p. 26. Counsel testified at the

- 10 -

evidentiary hearing that "Mr. Ybarra was more agitated, emotional, and volatile during the second trial." Doc. 1-7, p. 26. The trial court cautioned that "[i]t cannot be discounted that Mr. Ybarra's emotional state likely would have played a role in how he testified, how his testimony was received by the jury, and whether the jury found him credible." *Id*. In addition, counsel testified that the prosecution eliminated many of the deficiencies that existed in the first trial "making the State's presentation in the second trial a much stronger one." *Id*. Ybarra did not explain how his testimony in the second trial would have made a significant difference in the face of the State's improved presentation. For all these reasons, the trial court concluded that Ybarra failed to prove that had he testified in the second trial "the result in that proceeding would have been any different." *Id*. And therefore, counsel was not constitutionally ineffective. Ybarra has not shown that prior adjudication of this issue "resulted in a decision that was contrary to or an unreasonable application of Supreme Court precedent" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Ybarra asserts that attorney Stephen M. Weiss, a standard-of-care expert, stated in his affidavit that Ybarra's "testimony played a significant role in the fact that some jurors had a reasonable doubt as to his guilt on the Sexual Assault counts." Doc. 1-6, p. 17. It is certainly possible that it did play a significant role. It is also possible, as the trial court found, that the jurors had a reasonable doubt because they found the government's case less than persuasive. The real issue, however, was what role would Ybarra's testimony play at the *second* trial. Weiss's opinion fails to account for Ybarra's heightened emotional state at his second trial and the government's improved presentation. Both of these factors would have reduced the likelihood that Ybarra's testimony at the second trial would have been as well received and persuasive as it had been at the first trial. *See also*, Doc. 1-2, pp. 46-47 (Weiss testified that trial counsel's advice not to testify was within professional norms but there was little in the record indicating that they clearly explained their reasoning to Ybarra.).

Ybarra maintains that "he was the only source for the overwhelming majority of the evidence needed to sustain his denial defense, and impeach or at least oppose the allegations

asserted by M.B." Doc. 1-2, p. 60. He argues that without his live testimony it was impossible to present his defense that M.B. "was fabricating her allegation of sexual touching." Doc. 1-2, p. 63. Ybarra, however, overlooks his counsel's resourcefulness.

In her closing argument, defense counsel attacked M.B.'s testimony by highlighting the lack of corroborating physical DNA evidence. M.B's internal anal swab had none of Ybarra's DNA on it in spite of her testimony of penetration. Doc. 7, p. 1061, 1063. Likewise, Ybarra's penile swab had none of M.B.'s DNA on it. Doc. 7, p. 1062. Moreover, the massage table had none of Ybarra's DNA on it in spite of M.B.'s testimony that he hopped up on the table. Doc. 7, p. 1065. Counsel conceded that the *external* anal swab held 150 cells that matched Ybarra, but she had a plausible explanation. Doc. 7, p. 1067. M.B. sat for 30 minutes in her father's non-air-conditioned truck waiting for the police to arrive when it was 115 degrees outside. Doc. 7, p. 1068. Counsel theorized that M.B. would have been sweating and Ybarra's skin cells on her buttocks could have migrated to the anal area.

Counsel also highlighted Ybarra's testimony from a prior hearing. Doc. 7, pp. 1069-1070. In that testimony, Ybarra admitted that he met M.B. and "tried to go through her exercises with her." Doc. 7, p. 1070. He explained that he "did manual manipulation of her gluteal muscle" when she "told me that her butt was sore because she'd been worked out too hard." Doc. 7, p. 1070. When he realized what he was being accused of, he was adamant. Doc. 7, p. 1070. He stated: "I did not sexually assault this girl. I did not anally rape this girl. He says it over and over." Doc. 7, p. 1070.

Counsel then explained to the jury how M.B.'s testimony supported Ybarra's defense theory. M.B. admitted that she was sore "because she had so many volleyball practices." Doc. 7, p. 1071. She accepted his offer of a massage. *Id*. He massaged "her gluteal muscles and her thighs." *Id*. "And while doing this, he is explaining the anatomy of how those muscles interrelate with each other and how they're connected." *Id*. Counsel asked rhetorically: "Does that sound sexy to you? Does that sound like he's trying to get in her pants, or does that sound like he's trying to provide her some physical therapy?" Doc. 7, pp. 1071-1072. Even without Ybarra's live testimony, counsel was able to present Ybarra's defense theory. Counsel asked

- 12 -

the jury: "Does the physical evidence lay out a story of unconsensual [sic] anal rape, or does the physical evidence play out a story of a clinical assistant trying to provide a service to a client?" Doc. 7, p. 1074.

Ybarra has not shown that his live testimony at his second trial was indispensable to his defense. He has not shown that "the results of the proceeding would have been different" had he testified at the second trial. Or to be more precise, he has not shown that the trial court's resolution of this issue was habeas error.

Discussion: *Batson*

In Claim 2, Ybarra argues that the prosecution used a peremptory strike to remove a Black jury panel member contrary to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986). Doc. 1, p. 7; Doc. 1-2, pp. 76-77. The court concludes that this claim should be denied on the merits.

"The Equal Protection Clause forbids a prosecutor from challenging potential jurors solely on the basis of their race." *Ali v. Hickman*, 584 F.3d 1174, 1180 (9th Cir. 2009) (citing *Batson*, 476 U.S. at 89, 106 S.Ct. 1712). Courts apply a "three-part test when evaluating a defendant's equal protection challenge to a prosecutor's use of peremptory strikes." *Id*. "First, the defendant must make a prima facie showing that a challenge was based on race." *Id*. "If such a showing is made, the burden then shifts to the prosecutor to produce a clear and reasonably specific race-neutral explanation for challenging the potential juror." *Id*. (punctuation modified). "Third and finally, the court must determine whether, despite the prosecutor's proffered justification, the defendant has nonetheless met his burden of showing purposeful discrimination." *Id*. "To make this last determination, the court evaluates the totality of the relevant facts to decide whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Id*. "The consideration of purposeful discrimination at step three of the *Batson* inquiry is a factual one." *Id*.

On habeas review, the court's "standard of review . . . is 'doubly deferential' . . . because the federal court defers to the state reviewing court's determination of the facts, and the

- 13 -

reviewing court defers to the trial court's determination of the prosecutor's credibility." *Sifuentes v. Brazelton*, 825 F.3d 506, 518 (9th Cir. 2016). "This doubly deferential standard means that unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, [this court] must uphold it." *Id.* (punctuation modified).

"During voir dire, the trial court asked whether any prospective juror had a family member or close friend who had been involved in a similar case." *State v. Ybarra*, 2019 WL 2233299, at *4 (Ariz. Ct. App. May 22, 2019). "One of the venirepersons, A.P., answered that her uncle had been convicted of a sex-related crime when she was young, but that she did not know much about the case, and that she could be fair." *Id.*

Later, the court asked the jury pool about their exposure to legal TV shows. The following exchange occurred:

> THE COURT: How many of you are guilty like me of watching shows like CSI, Law & Order, Psych, The Practice?
>
> Some of you are very proud to raise your hand; okay? 90 percent of you. A.P., I'm going to pick on you a little bit because you raised your hand very quickly.
>
> A.P.: Oh, yes.
>
> THE COURT: Do you think those shows are real?
>
> A.P.: Absolutely.
>
> THE COURT: You do?
>
> A.P.: Well, some of them, you never know. I just watch them.
>
> THE COURT: Do you think they're more entertainment or they're more accurate?
>
> A.P.: It depends. I can't really state that.
>
> THE COURT: Okay. It depends on the show you're watching and what they show you; right?
>
> A.P.: Yeah, could be.
>
> \*       \*       \*
>
> THE COURT: It's more important that you pay attention to what's going on in the courtroom. Is there anybody that's going to have a problem doing that, if it doesn't live up to your TV expectations it would be difficult for you?

- 14 -

>   Sometimes people do. I don't think—A.P., you don't fall into that category; do you?
>
>   A.P.: No.

*State v. Ybarra*, 2019 WL 2233299, at *4 (Ariz. Ct. App. May 22, 2019). (punctuation modified).

"The state exercised one of its peremptory strikes on A.P., who was the only African-American venireperson, and Ybarra raised a *Batson* challenge." *State v. Ybarra*, 2019 WL 2233299, at *4 (Ariz. Ct. App. May 22, 2019). At first, the trial court questioned whether *Batson* applied because Ybarra was not African-American himself. *Id.* at *5. Nevertheless, the court "requested an explanation for the peremptory strike, thus completing the first step of its *Batson* analysis." *Id.* at *6.

In response, the state "provided three racially neutral reasons: (1) when the court asked about legal and crime TV shows, A.P. said she thought some of the shows were accurate, so the state was concerned that might affect her perception of what she sees at trial; (2) the state believed A.P.'s body language indicated that she 'didn't seem to understand some of the things that they were asking of her'; and (3) A.P. said she had an uncle who had been convicted of molestation." *State v. Ybarra*, 2019 WL 2233299, at *6 (Ariz. Ct. App. May 22, 2019); Doc. 8-2, p. 147. The prosecutor clarified that reason (1) was "primarily the reason that the State struck her." Doc. 1-2, p. 79.

The trial court found that "the state has offered not one but three separate race neutral reasons, and the Court's recollection of A.P.'s answer on the first was she was enthusiastic at her belief that the shows could be real, much more so than the other jurors." *Id.* at *5. The court opined that "[i]t is race neutral, and there is no question about that as are the other two reasons." *Id.* The court concluded that the state had "given sufficient race neutral reasons for her strike" and denied the *Batson* challenge. *Id.* at * 5.

The Arizona Court of Appeals observed that while the trial court "did not make specific factual findings about the intent, demeanor, or credibility of A.P. or the prosecutor, the record supports the court's implicit finding that the state was not purposefully discriminating against

- 15 -

A.P. when it exercised one of its peremptory strikes." *Id*. at * 6.  This court concludes that prior adjudication of this issue did not result "in a decision that was contrary to or an unreasonable application of Supreme Court precedent" or "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) ("[T]he petitioner must establish that the state court's decision rested on a finding of fact that is *objectively* unreasonable.") (punctuation modified) (emphasis in original).

Ybarra argues first that the trial court misunderstood *Batson's* scope and that error tainted his analysis.  Doc. 1-2, p. 90.  At one point, the trial court stated that "it did not necessarily believe that a prima facie showing had been made because A.P. was African-American and Ybarra is not."  *State v. Ybarra*, 2019 WL 2233299, at *6, n. 3 (Ariz. Ct. App. May 22, 2019) (punctuation modified); Doc. 8-2, p. 149.  As Ybarra correctly notes, this is an incorrect reading of *Batson*.  Doc. 1-2, pp. 90-93.  The Arizona Court of Appeals recognized this error and explained that "the state may not use peremptory challenges to discriminate against any cognizable group, whether or not the defendant is a member of that group." *Ybarra*, at *6, n. 3 (punctuation modified).  It held, however, that any error was harmless because despite its misunderstanding, the trial court requested an explanation from the state completing the first step in the *Batson* analysis.  *Id*.

Ybarra asserts that "the trial judge was erroneously predisposed to overruling Mr. Ybarra's *Batson* objection because of the judge's misunderstanding of the law" and therefore the court of appeals should have remanded for a new trial or at least employed heightened scrutiny of the trial judge's record and ruling.  Doc. 1-2, pp. 91-92.  This court does not agree. The trial court explained that Ybarra's *Batson* challenge would be denied because the prosecution provided "sufficient race neutral reasons for her strike." *Ybarra* at * 5.  The trial court's resolution of the issue did not rely on the fact that A.P. and Ybarra did not appear to share the same race.  There is no indication in the record that the trial court's analysis of the prosecutor's proffered reasons for her strike was affected by its misunderstanding of the scope of the *Batson* ruling.

The court now considers the three reasons that the prosecutor advanced to explain why she struck A.P. First, each reason is examined individually. "After analyzing each of the prosecutor's proffered reasons, our precedent suggests that the court should then step back and evaluate all of the reasons together." *Lewis v. Lewis*, 321 F.3d 824, 831 (9th Cir. 2003).

The prosecutor explained first that she struck A.P. because "when the court asked about legal and crime TV shows, A.P. said she thought some of the shows were accurate." *State v. Ybarra*, 2019 WL 2233299, at *6, Ybarra concedes that when A.P. was first asked if these shows were real, she said, "Absolutely." Doc. 1-2, p. 96. Later, however, A.P. walked back that statement and said that "It depends" when the judge asked whether those shows are "more entertainment" or "more accurate." *Ybarra* at *4. Ybarra argues that in light of A.P.'s more considered answers, no one, including the prosecutor, would believe her initial responses and conclude that she would have trouble properly interpreting the evidence presented at trial. This court disagrees.

The trial court observed that "A.P.'s answer [to the question] was she was enthusiastic at her belief that the shows could be real, much more so than the other jurors." *Id*. at *5. The court stated, "While she did admit that there are things that were entertainment value and things that were real, she—that was a legitimate understanding of how the state understood her answers to the Court's questions." *Id*. (punctuation modified).

Even though A.P. later appeared to recognize that there was a difference between entertainment and reality, one could conclude that her "enthusiastic" response to the judge's question indicated that she was more likely than other jurors to misunderstand the evidence presented at trial. And the trial court opined that it was reasonable for the prosecutor to interpret her response in that way. This court finds that the proffered reason for the strike is supported by the record.

The prosecutor also stated that she struck A.P. because her "body language indicated that she didn't seem to understand some of the things that they were asking of her." *State v. Ybarra*, 2019 WL 2233299, at *6 (Ariz. Ct. App. May 22, 2019). Ybarra asserts that this "explanation is not only pure fabrication and projection, it is seemingly racist." Doc. 1-2, p. 97. He argues

- 17 -

that the state's reasoning is "rife with discriminatory intent making its racism 'inherent' and thus making its justification for the strike 'facially invalid.'" *Id*. The court does not agree.

While it is possible that a strike based on a venirperson's demeanor could be a pretext for a discriminatory motive, it is not so "implausible or fantastic" that the court should assume that it is. *Garza v. Kernan*, 2009 WL 2777159, at *8 (E.D. Cal. Aug. 27, 2009) ("[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."), *subsequently aff'd*, 415 F. App'x 814 (9th Cir. 2011); *but see United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir. 1987) ("Excluding jurors because of their profession, or because they acquitted in a prior case, or because of a poor attitude in answer to voir dire questions is wholly within the prosecutor's prerogative. Such reasons may not be logical, but that's what peremptory challenges are all about."). Apart from Ybarra's suspicions, there is little in the record to support or disprove the prosecutor's assertion about A.P.'s demeanor. The court finds that the record neither supports nor refutes this proffered reason for the strike.

Finally, Ybarra argues that the prosecutor's statement that she struck A.P. because "A.P. said she had an uncle who had been convicted of molestation" is not supported by the record and does not provide a reasonable justification for her decision to strike A.P. from the jury. Doc. 1-2, p. 98. The court agrees.

A.P. stated during voir dire that her uncle was involved in a similar case but she "was too young to know anything about it." Doc. 8-2, p. 57. She further stated that "He did get out, but I think I can be fair. I was too young." Doc. 8-2, p. 56. During the *Batson* discussion, the prosecutor stated that she wanted to strike A.P., in part, because "A.P. said she had an uncle who had been convicted of molestation." Doc. 1-2, p. 98; Doc. 8-2, p. 147. The trial court found that the reason was "race neutral," and, on its face, it is. The record, however, shows that three other members of the jury, C.T., D.B., and L.H. also had a family member who had been accused of committing a similar offense. C.T. stated that a family member was accused of "some inappropriate behavior with younger, underage people." Doc. 8-2, p. 60. D.B. stated that his "brother was accused and served time for sexual molestation, child molestation." Doc.

8-2, p. 61. And L.H. stated that her "brother was convicted of sexual molestation." Doc. 8-2, pp. 61-62. The prosecutor's failure to challenge these three similarly situated venirepersons casts doubt as to whether this proffered reason for the strike is legitimate. *See Kesser v. Cambra*, 465 F.3d 351, 360 (9th Cir. 2006) ("If a prosecutor's proffered reason for striking a minority panelist applies just as well to an otherwise-similar nonminority who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step."). The court finds that the record refutes the prosecutor's assertion that she struck A.P. because "she had an uncle who had been convicted of molestation." *State v. Ybarra*, 2019 WL 2233299, at *6 (Ariz. Ct. App. May 22, 2019).

The prosecutor offered three reasons for her strike of A.P. The court finds that one of these reasons is refuted by the record. One is supported by the record, and one is neither supported nor refuted. Ybarra asserts that "the State's responses in Mr. Ybarra's case simply do not surmount the hurdle erected by *Batson* to test a prosecutor's proffered race-neutral reason for a juror strike." Doc. 1-2, p. 95. Ybarra's argument, however, elides this court's standard of review. This court does not decide the *Batson* issue de novo. Instead, this court limits its review to the state courts' prior adjudication of the issue. *See, e.g., Garza v. Kernan*, 2009 WL 2777159, at *9–10 (E.D. Cal. Aug. 27, 2009) ("While the undersigned might have reached a different conclusion here, that is not the issue. This court may not substitute its evaluation of the record for that of the state court."), *subsequently aff'd*, 415 F. App'x 814 (9th Cir. 2011).

The Arizona Court of Appeals analyzed the *Batson* issue as follows:

> Although the trial court did not expressly state whether Ybarra proved purposeful discrimination, it did say the state's race-neutral explanations were "sufficient." Indeed, one of the three race-neutral explanations was based on A.P.'s answers to questions asked by the court itself; thus, the court had the opportunity to consider A.P.'s demeanor and credibility, as well as that of the prosecutor. Although the court did not make specific factual findings about the intent, demeanor, or credibility of A.P. or the prosecutor, the record supports the court's implicit finding that the state was not purposefully discriminating against A.P. when it exercised one of its peremptory strikes. . . . Thus, we find no error, much less the clear error required to disturb the court's ruling.

*State v. Ybarra*, 2019 WL 2233299, at *6 (Ariz. Ct. App. May 22, 2019).

"Because [this] prior decision[] rest[s] largely on credibility, a reviewing court ordinarily should give those findings great deference." *Williams v. Rhoades*, 354 F.3d 1101, 1109 (9th Cir. 2004). "For [this court] to set aside the state courts' findings on discriminatory intent, [the defendant] must rebut the presumption of correctness by clear and convincing evidence." *Id*. Ybarra has not done that.

Ybarra has not shown that prior adjudication of this issue "resulted in a decision that was contrary to or an unreasonable application of Supreme Court precedent" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

RECOMMENDATION

The Magistrate Judge recommends that the District Court, after its independent review of the record, enter an order DENYING the petition for writ of habeas corpus. (Doc. 1) Ybarra's claim that trial counsel was ineffective is procedurally defaulted. In the alternative, it should be denied on the merits. Ybarra has not shown that if he had testified at his second trial, the results of the proceeding would have been different. The prosecutor's strike of the only African-American panel member was not illegal discrimination pursuant to *Batson v. Kentucky*.

Pursuant to 28 U.S.C. §636 (b), any party may serve and file written objections within 14 days of being served with a copy of this report and recommendation. If objections are not timely filed, they may be deemed waived. The Local Rules permit a response to an objection. They do not permit a reply to a response without permission from the District Court.

DATED this 2nd day of May,

Honorable Michael A. Ambri
United States Magistrate Judge